UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC BELTRAN,

    Plaintiff,

v.

NANCY A. BERRYHILL,

    Defendant.

Case No.17-cv-06674-NC

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 26, 29

Plaintiff Eric Beltran seeks judicial review of the defendant Commissioner of Social Security Nancy A. Berryhill's denial of his application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq. See* Dkt. Nos. 26, 29. Beltran argues that the Administrative Law Judge ("ALJ") failed to properly evaluate the medical record and his subjective complaints. The Court finds that the ALJ articulated sufficient reasons for his findings and properly evaluated the medical record. Accordingly, the Court DENIES Beltran's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**I. Background**

    **A. Procedural History**

On January 1, 2014, Beltran filed his fifth application for supplemental social security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*,

alleging that he was disabled as of June 14, 2013, due to his bipolar disorder. *See* Dkt. No. 21 ("AR") at 19, 207–15, 233. An ALJ held a hearing on Beltran's application on May 11, 2016. AR 40–71. On June 14, 2016, the ALJ found that Beltran was not disabled and denied his application. AR 19–34. The Social Security Administration Appeals Council denied review on September 22, 2017. AR 3–7. Beltran seeks judicial review of the ALJ's now-final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Both parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). *See* Dkt. Nos. 16, 17.

### B.   Undisputed Facts[1]

Beltran is a 31-year-old man with no past relevant work. AR 207–15. He stopped working on April 1, 2013, when he became incarcerated. AR 233. Beltran has a history of bipolar disorder, accompanied by mood swings, depression, and auditory hallucinations, along with substance abuse. AR 361–62. Beltran received treatment for bipolar disorder and chemical dependency during his incarceration (AR 365–66) and continued to receive such treatment after his release (AR 405–48). Beltran's mental health fluctuated—his mental health would improve with treatment and sobriety, then deteriorate when he misses appointments, stops taking his medication, and ends his sobriety. *See, e.g.*, AR 409–448, 753–765. In light of this history, Beltran alleges that he continues to suffer from mental illness and is disabled. *See* Dkt. No. 26 at 9.

#### 1.   Medical Evidence

During Beltran's incarceration at Santa Clara County Jail between April 22, 2013, and November 4, 2013, he received medical treatment for bipolar disorder, including prescriptions for ▇▇▇ (a mood stabilizer) and ▇▇▇ (an anti-psychotic). AR 549. Throughout Beltran's incarceration, he made marked improvements in his mental state. *See, e.g.*, AR 554–55. Beltran continued to take ▇▇▇ and ▇▇▇ to address his schizoaffective disorder, bipolar disorder, and drug dependency. AR 365–66, 379–80.

---

[1] Portions of this order are redacted to protect Beltran's privacy. An unredacted version of this order will be issued under seal.

2

Beltran received medical treatment with Momentum for Mental Health ("Momentum"). AR 409–448. On February 13, 2014, Beltran met with psychiatrist Erica Mitchell, M.D. who diagnosed him with bipolar disorder, but noted that he appeared stable and was doing well. AR 445. Dr. Mitchell reduced Beltran's dose of ▇ and started him on ▇ (an anti-psychotic). AR 445.

On March 31, 2014, Beltran consulted with psychologist Janine Marinos, Ph.D. for his disability benefits application. AR 401. Dr. Marinos noted that Beltran appeared sedated during the examination and had difficulty providing a clear medical history and maintaining focus. AR 404. She found that Beltran demonstrated mild impairment with regards to his insight and judgment. AR 403–04. Testing also demonstrated ▇ severe to moderate impairment with regards to his memory. AR 403. Dr. Marinos concluded that Beltran "would likely have marked difficulty at this time functioning effectively in a competitive job setting." AR 404. However, Dr. Marinos also concluded that Beltran would be able to work on a part-time basis with appropriate treatment and continued abstinence from drugs, but noted that Beltran was "vulnerable to repeated episodes of emotional deterioration" due to a poor history of psychiatric follow-up. AR 404.

Between August 5, 2014, to November 14, 2014, Beltran saw Jessica Vermeulen, R.N., at Momentum. AR 415. Beltran initially reported difficulty with focus and concentration (AR 415), but later reported improvements with focus while on medication (AR 411–14). Vermeulen adjusted Beltran's medication regime in December 2014 in response to an anxiety attack. AR 769. Beltran continued to improve. AR 409.

On November 20, 2014, Disability Determination Services ("DDS") physician E. Aquino-Caro, M.D., reviewed Beltran's medical records. AR 85–88. Dr. Aquino-Caro opined that Beltran had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration. AR 85. The doctor also concluded that Beltran's ability to remember, understand, and carry out detailed instructions was markedly limited, but Beltran's ability to remember and carry

out simple instructions was not similarly limited. AR 87. Thus, Dr. Aquino-Caro concluded that Beltran would be able to do "simple, routine" work in two-hour increments and could work full-time on a sustained basis. AR 88.

On February 17, 2015, another DDS physician, H. Amado, M.D., reviewed Beltran's medical records and arrived at similar conclusions to Dr. Aquino-Caro. Specifically, Dr. Amado concluded that Beltran was able to work simple, routine jobs involving one- to two-step job tasks and instructions. AR 101.

On April 22, 2015, Beltran met with Helen Osborn, R.N., at Momentum for medication management. AR 765. Beltran reported that he had been off his medication for the last few days and began acting "detached, more depressed, [and] worr[ied]." AR 765. The week prior, Beltran had tested positive for ▇▇▇▇▇▇▇▇▇. AR 665. Osborn diagnosed Beltran with bipolar disorder and drug dependence and prescribed a series of medications. AR 765. In a follow-up examination the next week, Osborn noted that Beltran appeared to have improved. AR 764.

On July 1, 2015, Beltran met with Momentum psychiatrist Alka Mathur, M.D. AR 759. Beltran reported that he had been feeling more depressed after being off his medication for three weeks because he missed intake appointments and was unable to get refills for his medication. AR 759. Dr. Mathur noted that Beltran appeared intoxicated and Beltran admitted to using ▇▇▇▇ prior to his appointment. AR 759. Dr. Mathur diagnosed Beltran with bipolar disorder, restarted him on ▇▇▇, ▇▇▇▇▇, and ▇▇▇ (a sedative), and stressed the importance of sobriety. AR 760. In a follow-up appointment several weeks later, Beltran reported feeling better and having cut down on ▇▇▇ use. AR 756.

During two subsequent visits in October and December 2015, Dr. Mathur noted that Beltran frequently failed to show up for appointments and had a poor history of following up. AR 750–51, 753. Although Dr. Mathur continued Beltran's medication both times, the doctor was concerned that Beltran was using and obtaining services solely for disability benefits. AR 751, 754. Beltran sporadically obtained medication through

4

Momentum over the next few months. *See* AR 790.

On October 18, 2015, at the request of Santa Clara County Department of Social Services, psychologist Paula Chaffee, Ph.D., completed her examination report of Beltran.[2] AR 741–48. In her report, Dr. Chaffee noted that Beltran had a history of substance abuse of ███████████ and ███████. AR 742. Dr. Chaffee noted that Beltran's bipolar disorder resulted in manic episodes marked by grandiosity and paranoia. AR 743. Beltran apparently exhibited "significant signs and symptoms of [post-traumatic stress disorder ("PTSD")]," but appeared alert and his speech was normal. AR 743–44. The report also noted that Beltran was socially unaware with impaired insight and poor judgment. AR 744. Ultimately, Dr. Chaffee diagnosed Beltran with PTSD, bipolar disorder, and a recovering addiction to ███████████ and ███████. AR 745–46. She concluded that Beltran's work-related abilities were moderately to severely impaired, except for his ability to communicate effectively. AR 747. As a result, Dr. Chaffee opined that Beltran required assistance for "supplemental funds management" and may need ongoing support. AR 748.

On January 28, 2016, San Jose police officers took Beltran to the Santa Clara Valley Medical Center after he reported to a medical facility claiming that he was hearing voices, suicidal, and paranoid.[3] AR 797. Beltran stated that he had recently used ███████████, affecting his judgment. AR 797, 838. After a brief stay, Beltran claimed he was fine and was discharged with instructions to follow up at Momentum. AR 807. Beltran did so a month later. AR 788.

On March 4, 2016, Beltran met with Ramandeep Kaur, M.D., at Momentum for medication management three days after his scheduled appointment. AR 785. Dr. Kaur

---

[2] Dr. Chaffee conducted the actual examination two months earlier on August 12, 2015. AR 741.

[3] In his decision and at the hearing, the ALJ stated that Beltran sought psychiatric care in order to make his girlfriend feel guilty about leaving him and to enable him to resume staying with her. *See* AR 22, 53. The Court is unable to find a factual basis for this finding in the administrative record. At most, Beltran's medical records and hearing testimony suggests that Beltran was "paranoid" about something "personal." *See* AR 52–53, 797.

5

noted that Beltran appeared cooperative and engaging, but was concerned that Beltran was seeking services solely to bolster his disability claim due to his continued noncompliance with medication. AR 786. In May, Dr. Kaur completed a Mental Impairment Questionnaire regarding Beltran's bipolar disorder and drug use disorder. AR 896–901. Dr. Kaur stated that Beltran remained paranoid, anxious, and suffered from delusions. AR 896. As a result, Dr. Kaur concluded that Beltran was significantly limited in his ability to do unskilled work except as to his ability to carry out simple instructions. AR 898–99. Dr. Kaur also opined that Beltran's limitations would remain regardless of his addiction. AR 901.

### 2. ALJ Hearing

On May 11, 2016, the ALJ conducted a hearing to review Beltran's disability application. AR 42. Beltran was present and represented by counsel. AR 42. Beltran and Susan Allison, a vocational expert ("VE") testified at the hearing. AR 46, 62.

Beltran testified that he had been diagnosed with bipolar disorder and, since 2013, had been unable to work due to his mental condition and homelessness. AR 47. He also testified that he suffers from PTSD due to abuse when he was a child and sometimes has auditory hallucinations. AR 56–57. Beltran admitted that he had been noncompliant with his medication because of his poor memory, homelessness, and lack of funds. AR 48. He also testified that he sometimes refuses to take medication purposely, believing that he may get sick from taking it. AR 48.

The ALJ questioned Beltran about his substance abuse relating to ▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮. AR 49–51. The ALJ questioned why Beltran refused to comply with his doctors' prescriptions and directions to stay sober, yet continued to take ▮▮▮▮ and ▮▮▮▮▮▮▮▮. AR 52. Beltran attributed his failure to regularly take his medication to a lack of reminders and support network. AR 52, 61.

Beltran also testified about his hospitalization in 2016. AR 53. The ALJ asked Beltran whether the hospitalization was due to a difficult relationship issue with his girlfriend, rather than to seek treatment. AR 53. Beltran clarified that he was delusional at

6

the time he was hospitalized. He asked to be released to his girlfriend after developing anxiety during his hospital stay. AR 53.

Finally, the ALJ questioned Beltran about his living situation and support network. AR 54. Beltran explained that he receives general assistance every month from his girlfriend and cousin. AR 54, 56. However, Beltran also testified that he still relies on local charities or churches for shelter, food, and a place to shower because the assistance from his girlfriend is less than $150 a month. AR 54–56. Beltran stated that he often uses the light rail to move from place to place, frequently riding without a ticket. AR 54–55.

The VE testified after Beltran. AR 62–68. The ALJ asked the VE what types of jobs a hypothetical individual without exertional limits could perform if he was limited to simple, repetitive tasks and could only occasionally interact with supervisors, the public, and coworkers. AR 64. The VE responded that Beltran could hypothetically perform work as a marker, assembler, or bagger. AR 64. She also testified that all three of those jobs were suitable for an individual who could never interact with the public. AR 65. Beltran's attorney then questioned the VE, asking about a hypothetical individual whose concentration and attention were markedly limited. AR 67–68. The VE responded there were no jobs in the national economy suitable for such an individual if he could not complete a regular workday or needed special supervision. AR 67–68.

### 3. ALJ's Decision

To qualify for SSI under the Social Security Act, a claimant alleging disability must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 48 U.S.C. § 1382c(a)(3)(A). An ALJ uses a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(1). If the ALJ finds the claimant disabled or not disabled at one of the steps, the ALJ makes his determination and does not proceed in his evaluation. 20 C.F.R. § 416.920(a)(4).

    **a. Step 1–3**

7

The ALJ could not determine whether Beltran was disabled at steps one, two, and three. AR 21–24. At step one, the ALJ found that Beltran has not engaged in any substantial gainful activity since he applied for disability on January 31, 2014. AR 21.

At step two, the ALJ found that Beltran suffered from two severe impairments: bipolar disorder with psychotic tendencies and polysubstance abuse with physiological dependence. AR 21. However, the ALJ found that the medical record suggests that Beltran's condition was not "what he purports it to be," citing opinions by his treating physicians that he was using their services to bolster his disability claim. AR 21. The ALJ also found that Beltran's drug addiction is not a "contributing factor material to the determination of disability" because there is nothing in the record suggesting that Beltran's psychiatric symptoms abated with sobriety. AR 22. Additionally, the ALJ found that Beltran's physical conditions (████████ and ████████) and remaining mental conditions (attention deficit hyperactivity disorder and PTSD) were nonsevere or unsupported by the medical record.[4] AR 22.

At step three, the ALJ found that Beltran did not "have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in" 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. AR 22–24; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A2, § 12.04 (May 24, 2016). Specifically, the ALJ found that the record demonstrated that Beltran only had moderate restrictions or difficulties with activities of daily living, social functioning, and concentration. AR 23. The ALJ also found that the record did not reflect "episodes of decompensation . . . of extended duration." AR 23. In the alternative, the ALJ also found that the record did not show a "medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities . . . ." AR 23.

### b. Residual Functional Capacity

---

[4] Dr. Chaffee diagnosed Beltran with PTSD. *See* AR 745–46. Beltran, however, does not challenge the ALJ's determination that his PTSD is nonsevere. *See generally* Dkt. No. 26.

8

Before proceeding to step four and five, an ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 416.945(a)(4)(iv). To determine RFC, an ALJ considers all of the claimant's severe impairments collectively. *Id.* § 416.945(a)(2). Here, the ALJ considered Beltran's hearing testimony and the medical record. AR 24–32.

First, the ALJ rejected Beltran's allegations that he was disabled due to his bipolar disorder as not supported by the record. AR 24–27. The ALJ discounted Beltran's testimony as internally inconsistent and inconsistent with the medical record. AR 25–26.

Second, the ALJ accorded little weight to Dr. Kaur's opinion testimony. AR 28–29; *see also* AR 895–901 (mental impairment questionnaire from Dr. Kaur). Specifically, the ALJ noted Dr. Kaur has a limited treatment relationship with Beltran of only two months. AR 29. While the ALJ agreed with Dr. Kaur's opinion that Beltran had moderate difficulties in maintaining social functioning and concentration, the ALJ otherwise disagreed with Dr. Kaur's opinion. AR 29. In particular, the ALJ pointed to medical records from October 2015 (AR 753–54), and January 2016 (AR 800–01) where Beltran appeared normal despite being off his medication. AR 29. The ALJ also found inconsistent that Dr. Kaur opined that Beltran could not work despite finding only mild to moderate limitations and only two episodes of decompensation. AR 29; *see also* AR 898–900.

Next, the ALJ considered Dr. Marinos's opinion testimony and accorded it some, but not great weight. AR 29–30; *see also* AR 401–04 (psychological screening evaluation by Dr. Marinos). The ALJ agreed with Dr. Marinos's diagnosis of bipolar disorder and polysubstance abuse, but disagreed with her opinion that Beltran had a marked limitation in his ability to function in a competitive work setting. AR 30. The ALJ also concluded that Dr. Marinos's opinion was undermined by her assertion that Beltran could reenter the workforce "in the coming months" because a marked limitation is one that is expected to last on a sustained basis. AR 30 (quoting AR 404).

Fourth, the ALJ accorded Dr. Chaffee's opinion little weight. AR 30–31; *see also*

9

AR 740–48 (screening evaluation by Dr. Chaffee). The ALJ agreed with Dr. Chaffee's diagnosis of bipolar disorder, but otherwise disagreed with her conclusions. AR 31. The ALJ discounted Dr. Chaffee's opinion because she did not evaluate more recent medical records where Beltran denied having auditory hallucinations, demonstrated a history of treatment non-compliance, and acknowledged a recent history of substance abuse.

Finally, the ALJ considered opinions by Dr. Aquino-Caro and Dr. Amado. AR 31–32; *see also* AR 80–90 (disability determination by Dr. Aquino-Caro); 92–104 (disability determination by Dr. Amado). Here, the ALJ disagreed that Dr. Aquino-Caro and Dr. Amado's assessments that Beltran had only a mild restriction on daily activities and mild difficulties in maintaining concentration. AR 31–32. The ALJ found that Beltran had moderate restrictions and difficulties in those two categories. AR 31–32. Nonetheless, the ALJ agreed with the doctors' conclusions that Beltran could do simple, repetitive tasks. AR 31–32.

Thus, the ALJ concluded that Beltran has the residual functional capacity to perform work involving simple, repetitive tasks that require no more than occasional contact with supervisors, coworkers, and the public. AR 24.

### c. Step 4–5

At step four, the ALJ could not determine whether Beltran was disabled because Beltran had no past relevant work. AR 32–33. At step five, the ALJ found that Beltran was able to work in the national economy. AR 33. Namely, the ALJ accepted the VE's testimony that Beltran could work as a marker, assembler, or bagger. AR 33–34. Thus, the ALJ concluded that Beltran was not disabled. AR 34.

## II. Legal Standard

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The decision of the Commissioner should only be disturbed if it is not supported by substantial evidence or if it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Substantial evidence is evidence that a reasonable mind would accept as adequate to support the conclusion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("[It] is more than a mere scintilla but less than a preponderance."). Even when the ALJ commits legal error, the decision must be upheld if the error is harmless. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). However, "[a] reviewing court may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)).

**III. Discussion**

    **A. Whether the ALJ Properly Discounted Beltran's Subjective Allegations of Disabling Impairment**

When assessing a disability claimant's testimony regarding the subjective intensity of symptoms, an ALJ must engage in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first "determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). If the claimant has presented evidence of an underlying impairment and there is no affirmative evidence of malingering, the ALJ must give "specific, clear and convincing reasons" to reject the claimant's testimony about the severity of his symptoms. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness,

11

1  inconsistencies in testimony or between testimony and conduct, daily activities, and
2  unexplained, or inadequately explained, failure to seek treatment or follow a prescribed
3  course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation
4  marks omitted). Even if the claimant's testimony suggests he may have some difficulty
5  functioning, it can still "be grounds for discrediting the claimant's testimony to the extent
6  that they contradict claims of a totally debilitating impairment." *Id.* at 1113 (citing *Turner
7  v. Comm'r of Soc. Sec.*, 513 F.3d 1217, 1225 (9th Cir. 2012)).

   Here, it is undisputed that Beltran presented objective medical evidence of bipolar disorder which could cause Beltran's asserted impairments: namely, difficulties with communication, task completion, concentration, understanding, and getting along with others. *See* AR 25. The ALJ also did not find affirmative evidence of malingering. Rather, the ALJ rejected Beltran's testimony for three reasons: (1) Beltran's ability to perform activities of daily living is inconsistent with his allegations that he is unable to work; (2) Beltran's allegations are inconsistent with the medical record; and (3) Beltran's history of non-compliance with treatment. AR 21–22, 25.

   For the first reason, the Court finds that the ALJ's decision was not "specific, clear and convincing." *Molina*, 674 F.3d at 1112. When considering a claimant's daily activities, an "ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Orn*, 495 F.3d at 639 (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)). Here, the ALJ concluded without further explanation that Beltran's daily activities, which included doing his laundry, talking to his mother on the phone, shopping, and managing his personal finances demonstrated transferable skills that undermine his claim of disability.[5] AR 25. These activities are not demanding and do not contradict

---

[5] The ALJ's characterization of Beltran's ability to "manag[e] his personal finances" is questionable and not supported by the record. This conclusion appears to have been drawn from a questionnaire filled out by Beltran, where he stated he is able to pay bills, count change, handle a savings account, and use checkbook/money orders. AR 25, 257. Beltran did not testify that he actively manages his own finances on a day-to-day basis. Indeed, as the ALJ acknowledged, Beltran is homeless; it is difficult to imagine what finances he has

12

Beltran's claims that he is unable to concentrate, get along with strangers, and complete tasks. *See Fair*, 885 F.2d at 603 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). The ALJ did explain that Beltran was "able to manipulate the public transit system to secure free transportation, which demonstrates an ability to perform multi-step tasks." AR 25. But this reason is not convincing; walking onto a train without a ticket is hardly a complex task given, as Defendants acknowledge, limited enforcement by transit police. *See* Dkt. No. 29 at 17.

The ALJ's error here, however, is harmless. As discussed further below, the ALJ offered additional reasons for finding Beltran less than fully credible. Because those reasons are specific, clear and convincing, the ALJ's credibility determination is adequately supported. *See Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162–63 (9th Cir. 2008) (affirming ALJ's decision finding claimant not credible concluding that two of the ALJ's reasons supporting his credibility determination were invalid).

The ALJ's second reason for finding Beltran not credible is that the medical record is inconsistent with Beltran's allegations. The ALJ pointed to two mental status evaluations completed on October 5, 2015 (*see* AR 750–754), and January 28, 2016 (*see* AR 800–01), where Beltran was found to have a normal mental status despite admitting to have been noncompliant with his medication. AR 25. In additional, the ALJ noted that Beltran's two brief periods of hospitalization were "not an accurate reflection of his normal functioning" because Beltran stabilized quickly with medication and was discharged with minimal symptoms. AR 25. The ALJ's reasoning is further bolstered by the fact that least two of Beltran's physicians opined several months apart that he was using and obtaining services solely for disability benefits. AR 21, 754, 786.

Finally, the ALJ also noted a long history of medical noncompliance. AR 22. At

---

to manage. AR 49.

13

the hearing, Beltran attempted to explain his noncompliance as a result of his paranoia, worrying that the medication would have an adverse effect on his health. AR 22, 48. However, Beltran repeatedly indicated throughout his medical record that the medication helped him feel better. *See, e.g.*, AR 577, 756, 762. Beltran's failure to offer a good reason for his noncompliance permits the ALJ to discount his credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (an ALJ may rely on a claimant's noncompliance with treatment to discount his testimony regarding the intensity of his symptoms); *see also Smolen v. Chater*, 80 F.3d 1272, 1284 (9th Cir. 1996) ("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so.").

In sum, the ALJ's adverse credibility finding is supported by specific, clear and convincing reasons.

### B. Whether the ALJ Properly Weighed the Medical Evidence in Determining Beltran's Residual Functional Capacity

"The ALJ is responsible for resolving conflicts in the medical record." *Carmickle*, 533 F.3d at 1164. Ninth Circuit precedent distinguishes three types of physician opinions: (1) those written by physicians who treat the claimant (treating physicians); (2) those written by physicians who only examine the claimant (examining physicians); and (3) those written by physicians who neither treat nor examine the claimant (non-examining physicians). *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). Generally, a treating physician's opinion carries greater weight than that of an examining physician, and an examining physician's opinion carries greater weight than that of a non-examining physician. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2011). An ALJ must provide "clear and convincing reasons that are supported by substantial evidence" to reject uncontradicted opinions of a treating or examining doctor. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). Contradicted opinions of a treating or examining doctor may be rejected by "specific and legitimate reasons that are supported by substantial evidence." *Id.*

14

1    Beltran argues that the ALJ failed to accord sufficient weight to Dr. Kaur, Dr. Marinos, and Dr. Chaffee's medical opinions. *See* Dkt. No. 26 at 13–15. He also argues that the ALJ accorded too much weight to Dr. Aquino-Caro and Dr. Amado's opinions. *Id.* at 16. The Court addresses each medical opinion in turn.

First, the ALJ did not err in according little weight to Dr. Kaur's opinion. Although Dr. Kaur is a treating physician and a treating physician's opinion is normally given great weight (*see Holohan*, 246 F.3d at 1202), Dr. Kaur appears to have only treated Beltran on a single occasion in March 2016. AR 785–87. In his written assessment, Dr. Kaur also voiced concerns that Beltran was "using and obtaining services solely for SSI/disability." AR 786. The ALJ also noted that Dr. Kaur's May 2016, mental impairment questionnaire was internally inconsistent. AR 29. In particular, Dr. Kaur assessed most of Beltran's mental abilities and aptitude needed to do work as "unable to meet competitive standards" or "seriously limited," but also assessed his functional limitations as "mild" or "moderate," which the questionnaire clarified as limitations which were not "such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis." AR 898, 900. Finally, the ALJ also considered medical reports by other treating physicians, such as Dr. Mathur's October 2015, report, which noted that Beltran appeared normal despite being off his medication. *See* AR 751, 756. Dr. Mathur also voiced concern that Beltran was using his services solely for his disability application. AR 755. The ALJ's assessment of Dr. Kaur's opinion is supported by substantial evidence.

Second, the ALJ did not err in according some, but not great, weight to examining physician Dr. Marinos's opinion. The ALJ mostly agreed with Dr. Marinos's assessment, but disagreed with Dr. Marinos's conclusion that Beltran had marked difficulty functioning effectively in a competitive job setting. AR 30. The ALJ pointed to Dr. Marinos's opinion that Beltran would be able to work at least on a part-time basis "[w]ith appropriate treatment and continued abstinence from drugs." AR 30, 404. Because "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits[,]" the ALJ's assessment is appropriate. *Warre v.*

15

*Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Next, the ALJ accorded little weight to examining physician Dr. Chaffee's opinion because Dr. Chaffee did not review much of the medical record and instead relied mostly on her own examination and information provided by Beltran. AR 31, 741. As with Dr. Kaur's opinion, the ALJ found that Dr. Chaffee's opinion was contradicted by Beltran's medical records, including his October 2015, visit with Dr. Mathur. AR 31. The ALJ also found that Dr. Chaffee also failed to consider Beltran's history of medical non-compliance and recent drug abuse. AR 31.

Finally, the ALJ afforded Dr. Aquino-Caro and Dr. Amado's opinions with some, but not great, weight. AR 31–32. Beltran contends that the ALJ should have accorded these opinions little or no weight because they did not consider later medical records and are inconsistent with his treatment history. However, the ALJ actually disagreed with Dr. Aquino-Caro and Dr. Amado's opinions regarding Beltran's limitations in activities of daily living and difficulties in maintaining concentration as understating the extent of Beltran's limitations. AR 31–32. Indeed, the ALJ concluded that Beltran's limitations in those areas were greater than assessed by Dr. Aquino-Caro and Dr. Amado. AR 31–32. The ALJ was nonetheless entitled to accord these opinions some weight because their remaining conclusions accords with other evidence on the record. Dr. Kaur, for example, also found that Beltran had only a moderate limitation with social functioning. *See, e.g.*, AR 900. Thus, the ALJ did not err in according some weight to these opinions.

## IV. Conclusion

Because the ALJ's finding of no disability is supported by substantial evidence, the Court DENIES Beltran's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: January 15, 2019

NATHANAEL M. COUSINS
United States Magistrate Judge

16